UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
OCT 13 2009
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

PEDRO ANTONIO MARIN, *et al.*,

Defendants.

Criminal Action No. 04-446 (TFH)

## MEMORANDUM OPINION

Pending before the Court is Juan Jose Martinez Vega's Motion to Recuse [Docket No. 135], which was joined by Jorge Enrique Rodriguez Mendieta and Erminso Cuevas Cabrera [Docket Nos. 136 & 137]. For the reasons set forth during the hearing that took place in open court on September 15, 2009, and for those that follow, the motion will be denied.

### BACKGROUND

The defendants' Motion to Recuse seeks an order disqualifying this Court from further proceedings in this case pursuant to 28 U.S.C. § 455(a). (Defs.' Mot. to Recuse 1.) The motion is premised on the following events that the defendants assert implicate the Court's impartiality:

I. On April 24, 2009, Martinez Vega filed a Motion to Dismiss Case Due to Prosecutorial Misconduct [Docket No. 102], which alleged that the prosecutor deliberately misrepresented the relevance of 10,000 pages of Spanish language documents that were provided to the defense as discovery. In that Motion to Dismiss, Martinez Vega argued that either (1) the prosecutor misrepresented the relevance of the documents "when he described them as 'discoverable' and 'material to the preparation of the defense'" during the August 12, 2008 hearing before Magistrate Judge Facciola or (2) "when confronted with an order to translate all or most of the documents, after having stubbornly refused to provide a meaningful index, and facing extraordinary costs (estimate by the United States at $800,000), Mr. Jackson simply lied about the relevance of the documents" during the March 12, 2009 hearing before this Court or (3) the prosecutor personally

reviewed the documents "'and was able to articulate a reason why some as yet unexplained change in circumstances caused him to change his original representations and coincidentally, decide that each and every page was no longer relevant.'" (Defs.' Mot. to Recuse 4-5 (quoting Martinez Vega's Mot. to Dismiss Case Due to Prosecutorial Misconduct 5-6).) Martinez Vega further asserted that "'[e]ither scenario involves a deliberate misrepresentation to the Court, and in Defendant's view warrant a dismissal based upon prosecutorial misconduct.'" (Defs.' Mot. to Recuse 5 (quoting Martinez Vega's Mot. to Dismiss Case Due to Prosecutorial Misconduct 5-6).) Martinez Vega also asserted that an evidentiary hearing was necessary to resolve this issue, which was reiterated in the defendant's reply brief. (Defs.' Mot. to Recuse 7.)

II. During the pretrial motions hearing held on July 7, 2009, Martinez Vega's counsel requested an evidentiary hearing regarding the pending Motion to Dismiss. (Defs.' Mot. to Recuse 9.)

III. The Court never conducted the requested evidentiary hearing and, instead, ruled on July 15, 2009, that the motion was denied because "the Court cannot conclude that counsel for the United States 'lied' about the relevance of the early discovery documents or engaged in a 'deliberate misrepresentation to the Court.'" (Order Denying Mot. to Dismiss, July, 15, 2009.)

According to the defendants, "the Court's <u>factual</u> conclusion as to the absence of bad faith on the part of the United States is unsupported by the record in this case and can only objectively be explained by an extrajudicial bias in favor of the United States and/or its prosecutors in this case." (Defs.' Mot. to Recuse 11 (emphasis in original).) The defendants arrive at this conclusion by arguing that:

> The facts concerning the good or bad faith of the government in giving defendants 10,000 pages of "completely irrelevant" untranslated Spanish documents, after initially telling the Court and defendants that the documents were being provided pursuant to Federal Rule of Criminal Procedure 16, all depended upon the decision making process of the prosecutors in the case. As such, they could not have been known to the Court simply through the litigation in the case. Therefore, Defendant contends that a reasonable person would conclude that a finding of no bad faith could only be explained if the Court was conclusively presuming that the United States had acted in [good] faith, despite the genuine issues raised by Defendant. This, Defendant asserts, is an impermissible bias on the part of the Court.

--2--

(Mem. of P. & A, In Supp. of Def. Martinez Vega's Mot. to Recuse ¶ 4.) The government opposed the defendants' motion on the grounds that it is frivolous and "is quite obviously a recusal motion resting entirely on the Court's rulings." (Govt's Opp'n Br. 11.) None of the defendants filed a reply brief.

## LEGAL STANDARDS

The defendants moved for recusal pursuant to 28 U.S.C. § 455(a), which states that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The Supreme Court has explained that "[t]he very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 865 (1988) (Stevens, J.). Accordingly, the legal standard is an objective one that inquires whether a "reasonable and informed observer would question the judge's impartiality." United States v. Microsoft Corp., 253 F.3d 34, 114 (D.C. Cir. 2001) (per curiam). It is well established, however, that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion" and "opinions formed by a judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky v. United States, 510 U.S. 540, 555 (1994) (Scalia, J.). Judicial rulings "[a]lmost invariably . . . are proper grounds for appeal, not for recusal." Id.

"To be disqualifying, the court's bias and prejudice 'must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned

from his participation in the case.'" United States v. Barry, 938 F.2d 1327, 1340 (D.C. Cir. 1991) (Wald, J.) (quoting United States v. Grinnell Corp., 384 U.S. 563, 583 (1966)). "Although a legal ruling may not itself serve as the basis for a motion to disqualify, a particular judicial ruling 'can be *evidence* of an extrajudicial bias or prejudice.'" Id. (internal citations omitted, emphasis in original) (quoting United States v. Hedt, 668 F.2d 1238, 1272 n.72 (D.C. Cir. 1981)). A judge need not, however, "recuse himself because of 'unsupported, irrational, or highly tenuous speculation.'" United States v. DeTemple, 162 F.3d 279, 287 (4th Cir. 1998) (Motz, J.) (quoting In re United States, 666 F.2d 690, 694 (1st Cir. 1981)). As the Fourth Circuit observed:

> To disqualify oneself in such circumstances would be to set "the price of maintaining the purity of appearance" too high – it would allow litigants "to exercise a negative veto over the assignment of judges."

Id. (quoting In re United States, 666 F.2d at 693). Likewise, the First Circuit noted that:

> [R]ecusal on demand would put too large a club in the hands of litigants and lawyers, enabling them to veto the assignment of judges for no good reason. Thus, compulsory recusal must require more than subjective fears, unsupported accusations, or unfounded surmise.

In re United States, 158 F.3d 26, 30 (1st Cir. 1998) (Selya, J.).

When considering a motion for recusal, "there is no support for the position that the facts alleged in the papers submitted by a person relying on section 455 must in every case be accepted as true, whether the papers be a verified memorandum or are in some other form." United States v. Heldt, 668 F.2d 1238, 1271 (D.C. Cir. 1981) (per curiam). "The very fact that section 455 is addressed directly to the judge makes it evident that some evaluation by the court of the facts giving rise to the motion is anticipated in most cases." Id. Moreover, it is in the trial court's discretion whether to hold a hearing. Id. at 1271-72. "The appropriate procedure . . . may

--4--

depend upon the nature of the allegations made." Id. at 1272. The D.C. Circuit has noted, however, that:

> Allegations regarding actual extrajudicial conduct of involvements, for example, may typically present a more compelling case for a hearing than a motion premised on rulings or comment made during actual courtroom proceedings which are urged as evidence of bias or prejudice stemming from an extrajudicial source.

Id. Ultimately, "cases implicating section 455(a) are fact-specific, and thus *sui generis*. Comparison, therefore, is an inexact construct." In re United States, 158 F.3d at 31. As the First Circuit explained:

> At one end are situations in which the hypothesis of partiality is so compelling that the judge has no real choice but to recuse herself. See, e.g., Fredonia Broad. Corp. v. RCA Corp., 569 F.2d 251 (5th Cir.1978) (involving a recusal motion based upon one party's representation by the judge's former law clerk, who had served in that capacity during a prior trial of the same action). At the other end are situations in which the hypothesis of partiality is so tenuous that the judge has no real choice but to sit. See Blizard v. Frechette, 601 F.2d 1217 (1st Cir.1979) (involving a recusal motion based upon nothing more than a judge's criticism of a party and her case in an opinion). Between these two polar extremes lies a zone in which the district judge's discretion holds sway. See In re United States, 666 F.2d at 695. If a case falls within this gray area, a court of appeals ought not to interfere.
>
> These categories operate on two levels: what is alleged and what is proven. See Blizard, 601 F.2d at 1221 ("A trial judge must hear cases unless some reasonable factual basis to doubt the impartiality or fairness of the tribunal is shown by some kind of probative evidence."); cf. Liljeberg, 486 U.S. at 865, 108 S.Ct. 2194 (admonishing that "it is critically important in a case of this kind to identify the facts that might reasonably cause an objective observer to question [the judge's] impartiality"). Consequently, there are situations in which the hypothesis of partiality sounds compelling to a reasonable listener, but the supposed facts upon which the hypothesis depends are, in the end, not proven. Without facts to substantiate a hypothesis of partiality, a case may well slide from one pole of the continuum to the other, or to some point in between.

Id.

## ANALYSIS

As mentioned above, the premise of the defendants' claim of bias is that the Court failed to hold an evidentiary hearing regarding Martinez Vega's Motion to Dismiss Case Due to Prosecutorial Misconduct and, as a result, must have presumed that the government acted in good faith. In which case, so the defendants contend, the Court must be biased in favor of the prosecution based on an unidentified extrajudicial source because "the Court's <u>factual</u> conclusion as to the absence of bad faith on the part of the United States is unsupported by the record . . . ."[1] (Defs.' Mot. to Recuse 11.) It is the defendants' hubris in this respect that reveals the flaw in their logic. To reach this conclusion the Court must embrace the defendants' view that their interpretation of the factual record is the *sine qua non*.[2] The Court, however, has a judicial obligation to carefully – and independently – assess the facts based on the record before it, and might not arrive at the same conclusion the defendants reached, as was the case with respect to Martinez Vega's Motion to Dismiss.

So the record is clear, the Court's decision to deny Martinez Vega's Motion to Dismiss was based solely on the legal proceedings in this case and facts the Court learned therefrom. See <u>United States v. Pollard</u>, 959 F.2d 1011, 1031 (D.C. Cir. 1992) (Silberman, J.) (noting that the district judge "was, of course, intimately familiar with the record and knew as a matter of fact" whether he had considered *ex parte* information). While considering the Motion to Dismiss, the

---

[1] The defendants proceed with this argument notwithstanding their concession that their "questions about the way in which the United States has conducted the case do not <u>compel</u> a finding that the United States acted in bad faith." (Defs.' Mot. 13 (emphasis in original).)

[2] The defendant states in his motion that he seeks recusal "only in regard to the <u>facts</u> of the Motion to Dismiss." (Defs.' Mot. 11 n.7 (emphasis in original).)

--6--

Court employed absolutely no extrajudicial knowledge about this case or the prosecutors involved in it. To the contrary, the Court found the factual record sufficient to assess the allegations of prosecutorial misconduct and an evidentiary hearing unnecessary under these particular circumstances.

Because the defendants' claim of judicial bias stems from the Court's ruling on Martinez Vega's Motion to Dismiss, some elucidation of the Court's decision denying that motion is warranted to assess whether a reasonable and informed observer would question this Court's impartiality. From the outset, the Court repeatedly observed that this is a very complex case involving an international narcotics conspiracy and an investigation that took place in Colombia, where much, if not most, of the evidence was obtained. (See, e.g., Order Granting Continuance, Dec. 18, 2007 (granting an "ends of justice" continuance under the Speedy Trial Act).) These proceedings have been complicated by the fact that, although the case involves a large number of defendants, only a few defendants have been extradited to the United States and the extradition process has been piecemeal with respect to when individual defendants appeared in the case. In addition, as the indictment states, the defendants are alleged to have had varying roles and relationships with respect to the Fuerzas Armadas Revolucionarias de Colombia – Ejército del Pueblo, an alleged narco-terrorist organization referred to as the FARC. Given that the government has implicated the FARC in this case, the scope of potential evidence that might be relevant to the defense is fairly vast and covers a large geographical area of Colombia. It also was the Court's understanding that the government's evidence consisted of documents received from Colombian law enforcement authorities via a Mutual Legal Assistance Treaty, which poses its own complications, the foremost of which is that the documents are in Spanish.

In light of the foregoing complications, the Court recognized early in the case that the discovery process would be ongoing, evolving, and could become protracted. Accordingly, after holding several status conferences, during which it became clear that the government's discovery involved large volumes of documentary and electronic evidence that were in Spanish, would need translation, and were not in a searchable format, the Court issued an order dated May 29, 2008, that referred the case to Magistrate Judge John M. Facciola for the purpose of facilitating the parties' reciprocal discovery obligations and to assist them to ensure that discovery proceeded in a timely fashion. (Order Referring Case to Magistrate Judge, May 29, 2008.) Judge Facciola subsequently held several status conferences and the Court reviewed the transcripts from each of these conferences in their entirety.

Of particular note, during the first status conference on August 12, 2008, Judge Facciola asked the prosecutor to explain the government's discovery process. (Hr'g Tr. 3-15, Aug. 12, 2008.) The prosecutor's explanation revealed that the government was turning over everything it received from Colombia except certain documents that it deemed posed security issues or that it otherwise concluded were not discoverable under Fed. R. Crim. P. 16:

> [W]hat we've been doing is reviewing the documents with Spanish speaking law enforcement agents, primarily DEA agents and some from the State Department, in order to determine whether or not there are any documents that we've received that are inappropriate for the discovery process, either because of security concerns or because they simply aren't discoverable under Rule 16.
>
> We're going through the process of extracting those documents and then essentially turning over the hard copies of the Spanish documents as quickly as possible to the defendants.

(Hr'g Tr. 3-4, Aug. 12, 2008.) The government further explained to Judge Facciola that:

> I think the majority of these documents we're turning over as documents that we believe <u>could</u> be relevant to the preparation of the defense, I think that's the Rule 16

--8--

> basis under which we're primarily turning them over, though some of them certainly are relevant to our case in chief.

(Hr'g Tr. 5, Aug. 12, 2008 (emphasis added).) This is the first point of divergence between the defendant's interpretation of the facts and the Court's interpretation of the facts. The defendant takes the prosecutor's statement to be an affirmation that all the documents the government was disclosing were <u>absolutely</u> relevant and material to the preparation of the defense pursuant to Fed. R. Crim. P. 16. The plain language, particularly when viewed in the context of representations the government made during the course of this status conference and those that followed, however, indicate to the Court some equivocation on the government's part. In context, and in light of the Court's own understanding of the proceedings in this case, it appears to the Court that the prosecutor was simply stating that the government was making most of the evidence received from Colombia available to the defendants given the possibility that the documents <u>might</u> be material to the preparation of the defense. Indeed, during a discussion about CD-ROM discs containing recorded telephone conversations, the government stated that "it's doubtful that the vast majority of those conversations would be offered into evidence [by the government]," (Hr'g Tr. 12, Aug. 12, 2008), "[b]ut to be frank . . . I think that it is quite <u>possible</u>, again, that <u>much</u> of this information is relevant and material to the defense and some of it is going to be used in our case in chief," (Hr'g Tr. 13-14, Aug. 12, 2008 (emphasis added).) Here again, the prosecutor is equivocal about whether the evidence absolutely is relevant and material to the preparation of the defense and, instead, indicates that the government is taking the stance of disclosing anything that the defense possibly might consider relevant.

Furthermore, the transcript from this hearing, as well as the others, is replete with discussions about the complexities of the discovery in this case because of its volume and the

fact that it is coming from Colombia, covers a large geographical area in terms of the indictment's allegations, is in Spanish, in some cases it is in formats that pose technical problems, and, as defense counsel concedes, in some respects it is of a poor quality. (See, e.g., Hr'g Tr. 4, 8-11, 16-18, 21-23, 25-29, Aug. 12, 2008; Hr'g Tr. 8-9, 17, 22-26, 36, 38-39, Dec. 9, 2008.) As a matter of fact, during the August 12, 2008, status conference, Martinez Vega's and Rodriguez Mendieta's attorneys both indicated that they had already reviewed certain discovery that they determined was not relevant to their clients, (Hr'g Tr. 20, 27, 29, Aug. 12, 2008), in which case logic dictates that they were aware the government was disclosing more than Rule 16 requires. Rodriguez Mendieta's attorney stated that she had no intention of reviewing the discovery documents until the government produced an index because it would be "irresponsible" to do so. (Hr'g Tr. 22, Aug. 12, 2008.) If, however, defense counsel really was operating under the misapprehension that all the discovery documents were material to the preparation of the defense, it would be irresponsible not to review them, regardless of whether they were in Spanish.³ Which leads the Court to infer that counsel understood that, at least with respect to the individual defendants, they knew the discovery contained documents that were not relevant to their cases. Martinez Vega's attorney even pointed out that some audio discovery appeared to have been turned over to the defense without any review at all by the government, in which case a relevancy determination could not possibly have been made. (Hr'g Tr. 29, Aug. 12, 2008 (stating "[s]o it would appear that at least these six disks of audio tapes were provided

---

³ As the Court noted in its July 15, 2009, order, defense counsel were advised early in the case that the Court would authorize translators to assist them to review the documentary discovery. (Order Regarding Pending Motions, July 15, 2009.)

--10--

apparently by the Colombian government to the U.S. government, without anybody having reviewed them").)

On November 18, 2008, the government notified defense counsel by letter that it planned to translate only a small subset of the 10,000 documents originally disclosed, namely about 1,000 documents. This led to further court proceedings before Magistrate Judge Facciola to determine whether the government should be ordered to translate all the documents. Significantly – and further bolstering the Court's conclusion that the government consistently indicated that it was taking a liberal approach to discovery – during the next status conference on December 9, 2008, the prosecutor expressly stated that:

> Certainly, the information that we turned over, we believe, <u>goes beyond our Rule 16 obligations</u>. It's <u>everything we could conceivably turn over for any purpose</u>.

(Hr'g Tr. 4, Dec. 9, 2008 (emphasis added).) After discussions about problems with the index for the documentary discovery, the prosecutor also stated that "I think that to the extent that the index makes clear where specific portions of the documents relate to each defendant, <u>the process of culling out what it is going to be relevant to each defendant</u> is a much smaller task at this point, than one might imagine." (Hr'g Tr. 41, Dec. 9, 2008 (emphasis added).) Moreover, Martinez Vega's attorney anticipated that the government might conclude that some of the discovery was irrelevant when he again raised the issue about the CD-ROM discs containing audio recordings that appeared to have been disclosed to the defense without any government review beforehand:

> I just would remind the Court that we received about 25 discs of material that at least have labels of some sort on them, something identifying, apparently either by dates or by people, or nicknames, or something like that, none of which were familiar to me or my client, but then there were an additional six discs that simply are labeled, "Additional CTI Intercepts," and you open it up and it says, "New calls for review," and there's one, two, three, four, five, six discs of those. They don't appear to be organized in any fashion, and I would ask of the Court – of Mr. Jackson, through the

--11--

Court, when he's talking about saying, "The extent of the review of those CDs varies," what exactly is the position, because the index that he provided us before did not purport to cover those, and we would ask that an index be provided to cover that.

I mean, it may be that Mr. Jackson will get up and say, "You know, we just gave you all that stuff, but" we don't – "It's not relevant, and we're not going to use it, and it's not important," but it's my position, the same with the 10,000 pages of documents, that if they gave it to us, they have some obligation to tell us what it is that they're giving us, particularly when they're not in our native language.

(Hr'g Tr. 32-33, Dec. 9, 2008.)[4]

It also is noteworthy that, nearly two months after that status conference, Judge Facciola issued an order in which he stated:

> The government has made a production of documents received from the government of Colombia or otherwise in its possession to the defendants. We have ascertained that any attempt to scan the documents into digital form and then search them using optical character recognition would be fruitless; such an effort was made and failed and no one can see any better way to do it. Thus, the only guide to the contents of the documents is an index that has been prepared by DEA and other agents working on the case who can read the documents in Spanish. While the index is in English, the documents are in Spanish and the lawyers for the three defendants have differing capabilities in translating Spanish into English. <u>The hope has always been that the index would enable the lawyers to quickly ascertain which of the documents are, in the language of Rule 16 of the Federal Rules of Criminal Procedure, "material to preparing the defense."</u> Unfortunately, the parties do not agree that the index that has been provided is sufficient.

(Magistrate Judge Facciola's Order Regarding Discovery, Jan. 28, 2009 (emphasis added).)

Judge Facciola further stated that "[i]t has been my hope and, I presume, the hope of the parties, that we could reduce the burden, which will be borne by the taxpayer, of translating these

---

[4] Notably, Martinez Vega's attorney appears to be arguing that, if the government discloses any evidence it should be required to provide an index of that evidence so the defendants can determine the evidence's relevance rather than relying on the government's assessment of it, which confirms that the parties might disagree about what is relevant. In which case it seems unsportsmanlike to penalize the prosecutor for giving the defendants the opportunity to review the bulk of the government's evidence to make their own determination about whether there is anything they consider helpful to the defense notwithstanding the government's ultimate characterization of some or all of the material as irrelevant.

voluminous documents because the attorneys could consult an appropriately detailed index to determine <u>which documents likely contained information important to the case.</u>" <u>Id.</u> (emphasis added). As demonstrated, Judge Facciola's order unmistakably states that the Court understood that the purpose of the original indexing process was to provide a means for the defendants to "quickly ascertain which of the documents are, in the language of Rule 16 . . . 'material to preparing the defense.'" <u>Id.</u> This point would be superfluous if it was already understood that all 10,000 documents originally produced by the prosecutor were material to the preparation of the defense. Clearly, at a minimum, the Court understood that the scope of the government's original production might contain documents that do not necessarily meet the standard for disclosure pursuant to Fed. R. Crim. P. 16. Judge Facciola's order goes on to state his strong recommendation that the government translate all the documents, but limits the court order to those documents that the government plans to use in its case in chief, that are material to the defense, or that tend to exculpate the defendants. <u>Id.</u>

About two weeks later, during the subsequent March 9, 2009, status conference to further discuss whether the government should be required to translate all 10,000 documents, the government stated:

> I would point out that there is a balance between our ability to provide defense counsel with all of the information that they could possibly look towards, in terms of putting together a defense, and all of the piece [sic] of information which could conceivably constitute a Rule 16 disclosure, and time.
>
> Here, we're faced with the choice between either providing a very limited piece of the universe of information that could be accessible to them, that could potentially be useful to them, and working with that, <u>or essentially being punished for giving defense counsel a broader portion of the universe of documents that could be useful to them.</u>
>
> There are literally millions of documents that we potentially could have gotten from the Colombian government, that could've been useful to defense counsel, and what we provided initially was a very small subset of the documents that we thought were

--13--

either <u>potentially</u> material to the defense, or <u>potentially</u> Rule 16 discovery of things that we would've used. We've now narrowed that universe, and I don't think that the fact that there was an initial production of 11,000 documents means that all of those documents are necessarily material to the defense or constitute <u>Brady</u>.

(Hr'g Tr. 24, Mar. 9, 2009 (emphasis added).) During this same hearing the government agreed to certify that there was no <u>Brady</u> evidence or documents required to be disclosed pursuant to Fed. R. Crim. P. 16 in the remaining 9,000 or so documents that the government did not intend to translate. <u>Id.</u> at 25. When defense counsel questioned whether the original 10,000 documents were "useless," Judge Facciola explained:

> [A]s I understand it, [the prosecutor] said there was a universe of over a million [documents]. From those million, he came down to 10,000 that might be – potentially fall within Rule 16, or be useful to you, or be introduced in evidence.
>
> Now, from those 10,000, he is now ready to certify that only the 1,000 that he's given you, and that is going to be translated, are the only ones that meet any obligation he has to produce them, whether it flows from being material to the defense of the Rule 16 or a <u>Brady</u> obligation, or giving you the evidence that he intends to use at trial. That's what he just said.

<u>Id.</u> at 26. Likewise, during a March 12, 2009, hearing before this Court, the prosecutor stated:

> There is nothing really exceptional about the fact that we initially turned over a group of Spanish documents that appeared to be the 10,000 or so documents that we initially thought were the most relevant and that we would potentially be using based on our – based on what we received from the Colombian government, and that as time has gone on and we have done the discovery index, we have reviewed that set of documents more with Colombian authorities and with DEA here, we have been able to winnow the universe of documents that fit within the description of important to the trial.
>
> I think this is typical, fairly typical in these cases, or in any criminal case.

(Hr'g Tr. 36, Mar. 12, 2009.) The prosecutor further stated that:

> We think that we are translating all of the documents that we would either use at trial at this point or that would be helpful to the defense, <u>and we think that the index that we created of those documents would assist the defendants in identifying any additional portion that they thought was critical – critical to their defense and needed to be translated in addition to the thousand pages that we are already translating.</u>

--14--

> We endeavored, after we received Magistrate Judge Facciola's order, to investigate the possibility of translating this to assess how difficult it would be, and we spoke to a contractor who could assemble a team of translators that could work on this project, and their cost estimate for translating the remainder of these documents was approximately $815,000, and they estimated using these multiple translators it would take them approximately 11 or 12 months to complete it.

(Hr'g Tr. 8-9, Mar. 12, 2009 (emphasis added).) The Court views these statements to be consistent with how the process evolved, particularly the fact that the government made clear early on that it was taking a liberal approach to discovery disclosure by providing the defendants with a broad scope of the documents it received from Colombia.

Without belaboring the point, and viewing the transcripts in context and in their totality, along with the entire record in this case, with which this Court is intimately familiar, the Court finds that the record factually supports its conclusion that the government originally offered the defendants access to the broadest swath of evidence the government received from Colombia while engaging in a "culling" process according to which it continued to refine the sphere of documents that would be used in its case in chief, that potentially could be considered Brady material, and that in fact were material to the preparation of the defense pursuant to Fed. Rule Crim. P. 16. Moreover, the fact that the government was taking this approach was never a mystery, as demonstrated by the transcripts of the status conferences before Judge Facciola, Judge Facciola's orders, and the status conferences over which this Court presided. Even the most perfunctory review of the status conference transcripts reveals the complex, dense, and, admittedly, frustrating nature of the discovery process in this case involving volumes of evidence from Colombia that are in Spanish. At worst, though, a reasonable – and, importantly, informed person – would characterize the discovery process as convoluted, disorganized and mismanaged in many respects, but the record reveals no inconsistency between the prosecutors early representations about the nature of the 10,000 documents originally disclosed to the defense and

--15--

its representations later in the case that would be sufficient to rise to the level of prosecutorial misconduct for lying to the Court.[5] Finally, no evidentiary hearing was warranted because the record was well established and contained the facts necessary for the Court to evaluate whether the alleged prosecutorial misconduct occurred, the defendants' desire to delve into the prosecutor's thought process notwithstanding.

Obviously, the defendants disagree with the Court's analysis, which is their prerogative. Regrettably, though, the defendants attempted to manufacture a judicial bias out of what ultimately is revealed to be a pedestrian difference of opinion about the Court's factual conclusions and judicial ruling on Martinez Vega's Motion to Dismiss, which precedent makes absolutely clear is not a legal basis for disqualification. See Liteky, 510 U.S. at 555; Liljeberg, 486 U.S. at 865; Microsoft Corp., 253 F.3d at 114; Barry, 938 F.2d at 1340. The defendants' posture and decision to file this motion is regrettable because, by filing this frivolous motion, the defendants trivialize and undermine a principle that serves as an imperative to the viability of our judicial system and the guarantee of justice. The impartiality of the Court should not be treated so lightly, and certainly should not be treated as a mere tactical pawn to be gamed by litigants who are simply unhappy that judicial rulings did not go their way. Particularly in a case such as this in which another nation has entrusted one of its citizens to this Court with assurances that its citizen will be treated justly and fairly. Undoubtedly, this Court takes very seriously its responsibility to carry out that promise.

---

[5] Martinez Vega's Motion to Dismiss alleged misconduct based only on the prosecutor's representations to the Court and not on the volume of documents the government disclosed to the defense and later characterized as irrelevant.

--16--

In the final analysis, the defendant's motion to recuse is devoid of any basis in fact or law. As stated previously, the Court had no extrajudicial source for its ruling and the defendants' mere disagreement with the Court's interpretation of the facts is patently insufficient to meet the legal standard for disqualification pursuant to 28 U.S.C. § 455(a). The motion is frivolous and an ill-conceived attempt to cast aspersion on the integrity of the Court when there is no basis to do so. The defendants waited, literally, until the eleventh hour to file this motion before an important pre-trial hearing and, as a consequence, witnesses the government flew in for the proceedings had to be rescheduled and evidentiary hearings were canceled. All in all, the motion served only to further delay these important proceedings, and did so unnecessarily and without any legal merit.

## CONCLUSION

For the foregoing reasons, Juan Jose Martinez Vega's Motion to Recuse will be denied. An appropriate order will accompany this Memorandum Opinion.

October 13th, 2009

Thomas F. Hogan
United States District Judge